UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:  John M. Mancuso and                                    Case No. 12-31848
        Colleen M. Mancuso,                                    Chapter 13

                        Debtors

### Memorandum-Decision and Order Determining Value of Residence

John and Colleen Mancuso ("Debtors") filed a joint chapter 13 proceeding on October 3, 2012. On January 23, 2013, Debtors filed the current motion seeking to declare the mortgage held by Empower Federal Credit Union ("Empower") against the Debtors' residence (i) fully unsecured and (ii) subject to modification, pursuant to 11 U.S.C. § 506(a) and § 1322(b)(2) (the "Motion").[1] Empower filed opposition to the Motion on February 14, 2013. After an initial hearing and a period of informal discovery, the court issued a scheduling order and held an evidentiary hearing on May 23, 2013.

**Jurisdiction**

The court has core jurisdiction to hear this matter and enter a final order pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157 (b)(2)(B) and (K). The parties have consented to this court's jurisdiction to hear and determine this matter.

**Background**

Debtors reside at 5 Green Fir Circle, Syracuse, New York (the "Property"). Empower filed a secured claim, based upon a note and mortgage duly recorded on April 27, 2010 against

---

[1] Notwithstanding the declaratory nature of the relief sought, this District has generally allowed a party to seek the relief by motion. *See In re Robert*, 313 B.R. 545 (Bkrtcy. N.D.N.Y. 2004). As explained more fully, *infra*, the court may have to determine the relative amount and priority of the liens affixed to the residence, which, arguably, could trigger application of Part VII of the Federal Rules of Bankruptcy Procedure. Nevertheless, since no objection has been raised as to any procedural infirmity in seeking the relief by motion and the affected parties are being afforded a full opportunity to be heard with no resulting prejudice, the court finds that any such objection to have been waived. *See In re Command Services Corp.*, 102 B.R. 905 (Bkrtcy. N.D.N.Y. 1989).

1

the Property, in the amount of $59,680.18. Debtors have proposed a plan that treats Empower's mortgage lien claim as unsecured and proposes to pay a 2.5% dividend. Empower objected to confirmation. Whether the plan in essentially its current form proceeds to confirmation depends upon the outcome of the current Motion.[2] Relying on the first mortgage filing against the Property on December 24, 2002 by JPMorgan Chase Bank, N.A. ("Chase") and Chase's proof of claim filed in the amount of $128,544.93 (Claim No. 15-1), the Debtors aver that there is no equity in the Property to support the later mortgage filed by Empower. Empower vigorously contests this assertion. Empower claims that (i) the Debtors understate the value of the Property by $28,000 and (ii) a subsequently recorded Loan Modification Agreement dated October 15, 2010, entered into by Chase with the Debtors, to which Empower did not consent nor subordinate its secured lien position, effectively bifurcates Chase's lien into a first and third lien position against the Property.[3] As a result, Empower claims that there is some equity to support its lien, which defeats the Debtors' ability to modify their residential mortgage under 11 U.S.C. § 1322(b)(2). *See In re Pond*, 252 F.3d 122 (2d Cir. 2001).

On the return date of the evidentiary hearing, Debtors disclosed that their request of opposing counsel for a consensual adjournment of the hearing to pursue further discovery as to the Loan Modification Agreement was denied. With two expert witnesses present in the courtroom ready to testify as to value, the court decided to proceed to hear the evidence as to the Property's value. Simultaneously, the court announced that it would keep the record open on the

---

[2] There are two other pending objections to confirmation, one by the chapter 13 trustee (Doc. No. 21), requiring Debtors' counsel to file the certification required by Local Bankruptcy Rule 3015-1, and one by JPMorgan Chase Bank, N.A. (Doc. No. 28), indicating that the amount of arrearages included in its claim are $820.84 higher than what the plan provides. Presumably, the Debtors can readily address these minor objections which, separately, should not derail confirmation.

[3] The Loan Modification added $15,045.93 for "capitalized interest, fees, expenses, and other amounts due under the terms of the original Mortgage/Deed of Trust/Trust Deed" to the then outstanding principal balance of $113,254.37. *See* Exhibit 4 at page 27 of the attachment to Chase's proof of claim.

2

underlying Motion and preserve the parties' respective rights and arguments as to the effect of the Loan Modification Agreement to be heard at a later date, should resolution of that issue become critical in deciding the Motion once value has been determined. Accordingly, this Memorandum-Decision is confined to determining the value of the Property based upon the record before the court.

**Debtors' Valuation**

Debtors presented the testimony of Richard W. Thomas who performed an appraisal of the Property as of September 10, 2012. Mr. Thomas has had experience in the real estate business since 1973. He began as a licensed real estate agent in 1973, subsequently obtained a real estate broker's license in 1978 and opened his current firm, Thomas Realty and Appraisal, in 1984. He has been certified as an FHA appraiser and, from 1987 through 1995, was the exclusive Appraisal Management Broker for United States Department of Housing and Urban Development ("HUD") Region II based in Albany. Mr. Thomas served for two years on the Board of Assessment Review for the City of Syracuse and has continued to perform appraisals for FHA approved and conventional mortgaged properties. He testified that of the "thousands" of appraisals he has performed, 85-90% involve properties in Onondaga County, and 60% of those were in the City of Syracuse. Mr. Thomas was qualified as an expert.

Mr. Thomas's Appraisal Report (Debtors' Exhibit B) describes the Property as a 7 room, 4 bedroom, 2½ bath raised ranch with an attached two car garage, two fireplaces and a covered porch. The .57 acre lot on which the house sits has no rear yard due to a steep, wooded incline at back. Mr. Thomas ascribes 1,770 square feet as the "gross living area," or "above grade" living space, of the Property. He testified that he obtained the square footage from the Onondaga County public records and that no survey of the Property was available to him at the time he

3

performed his appraisal. Using the sales comparison approach, Mr. Thomas values the Property at $106,000 as of September 10, 2012.

Mr. Thomas utilized three comparables— each located within a 3 mile radius of and similar in style to the Property— all of which sold within the 8 months prior to the effective date of the report for between $102,500 and $115,000. Mr. Thomas then adjusted downward by (i) $3,500 uniformly for "site" because the comparables, though of smaller lot size (.38 acre, .14 acre, .24 acre), have "totally usable lots" and (ii) $1,500 on one comparable that had central air conditioning, which the Property does not have. The comparable sale numbers were adjusted upward when compared to the Property by (i) $500 if the comparable was lacking a room and/or half bath, (ii) an additional $500 for the covered porch that the Property has, (iii) $1,000 for the second fireplace and (iv) $1,500 for the additional bay in the two-car garage if the comparable had a single car garage. Mr. Thomas described the "effective age" of the house, which was built in 1969, as between five to seven years. In explaining this point, he testified that the house provided no functional obsolescence and was basically in average condition for its age. He included the finished part of the downstairs "basement,"[4] consisting of an office/den and ½ bath, as part of the stated 1,770 square feet of gross living area. Mr. Thomas did not attribute any value to a separate shed on the Property, indicating that it is portable and not part of the gross living area. Nor, did he attribute any value to a storage area under the porch.

On cross examination, Mr. Thomas admitted that although his New York license as a certified appraiser was active at the time of his report, his license had expired due to his failure to complete the requisite 28 hours of continuing education credits required by New York State and had not yet been renewed. He testified that the lapse in securing the requisite credit hours was

---

[4] Mr. Thomas's report describes the Property as actually having "No Basement." His view is that the entire house is built on a concrete slab and that no part of the building is below grade.

4

due to an illness and that upon completing the education requirement, his license would be renewed.

The only additional testimony presented in support of the Debtors' proof of value was offered by Debtor John Mancuso. Mr. Mancuso testified that, in connection with successfully challenging the County's tax assessment of the Property at some earlier point, he had measured his house and arrived at a total of 1,770 square feet for the gross living area— the number now reflected in the County's records. This is a lower number that what the County's records had originally reflected and is the number utilized by Mr. Thomas in his appraisal report.

**Empower's Valuation**

Empower introduced the testimony of John A. Mody Jr., of Mercury Appraisers, Inc. Mr. Mody has been appraising residential real estate for the past 23 years, and has been licensed as a certified appraiser in New York since 1991. He has performed appraisals for a variety of clients including lenders and insurance companies in Onondaga and neighboring counties. Without objection, Mr. Mody was qualified to testify as an expert.

Mr. Mody originally appraised the Property in 2007 for $162,000. (Creditor's Exhibit 10). His recent appraisal, dated as of January 30, 2013, values the Property at $134,000, utilizing the sales comparison method. (Creditor's Exhibit 6).

Mr. Mody testified that, when performing an appraisal, he generally first looks at all available information including census data, tax maps, county records and any survey that he can locate of a subject property. He testified that a survey is essential to get the exact measurements of a property because having the exact measurements assures that when utilizing comparable sales, one is comparing "apples to apples." He stated that he never relies on a county's records for gross living area as these measurements are often inaccurate. He attributed this to the fact

5

that assessors value several thousand properties at one time and cannot be as exacting. Mr. Mody testified that on a site visit, he takes detailed notes of every room on a site plan, starting with the basement and working his way up through the house. He physically measures the outside of the house, verifying the gross living area against the dimensions shown in the survey.

Mr. Mody confirmed that this was the process he followed in performing his most current appraisal of the Property.

Mr. Mody utilized a survey produced by R.J. Lighton to verify that his measurements were accurate and calculated that the house had an above grade gross living area of 1,512 square feet. Based upon guidelines provided by Fannie Mae and HUD, Mr. Mody testified that only finished, above grade areas should be factored in determining gross living area. He testified that the guidelines provide that garages and basements— including those partially above grade— should not be included in the calculation of gross living area and, therefore, he did not include the 767 square feet ascribed to the basement area of the Property, which does not have ventilation or windows to the back. He did, however, attribute a value for the basement area on the uniform residential appraisal report on the "Basement & Finished Rooms Below Grade" line.

Mr. Mody's report indicates an "effective age" for the house of 35 years. Mr. Mody explained that the term "effective age" refers to what a property currently looks like. He testified that the Property has not had many upgrades and that the house looks close to its age. He further testified that effective age is not determined by depreciation but factors into the determination of value when using the cost approach.

Mr. Mody's report draws on five comparable sales that all occurred within a year and four days of his appraisal and within eight months of Mr. Thomas's appraisal. The comparables utilized are of similar style— "raised ranch," with one "split level"— and each is located within

6

a 3 mile radius of the Property. No adjustment was made as to "site." Although the Property is larger than the comparables utilized— .57 acre as compared to .40, .39, .24, .28, and .26 acre— the appraisal takes into account that much of the Property's site forms the steep incline in the rear of the house. Four of the comparable sales were adjusted downward by $10,000 to account for the estimated $10,000 in cosmetic work that the Property requires. Comparable sale three was adjusted downward by $20,000 due to the comparable's better condition and "significant updates." Comparable sales were further adjusted up or down in comparison to the Property by (i) $1,500 for central air, (ii) $1,000 for each additional room, (iii) $1,000 for each bath, (iv) $1,000 for the covered porch, (v) $1,000 for the patio, (vi) $1,500 for each fireplace, (vii) $2,500 for an additional bay in the garage, (viii) $1,000 for the shed and (ix) $1,000 for the storage area.

**Analysis of the Testimony**

The approach taken by each of the respective appraisers is similar: an initial investigation of records pertaining to the Property, followed by a detailed site visit and a search for and analysis of comparable sales. Both appraisers reject the cost approach and income approach in valuing this single family residence. It is noteworthy, however, that in utilizing the sales comparison approach, none of the same comparables are used by Mr. Thomas and Mr. Mody. The court surmises that this is because of the different starting points from which they begin their analysis— 1,770 square feet of gross living area for the Property according to Mr. Thomas and 1,512 square feet of gross living area according to Mr. Mody. From that point, the reports diverge farther as to what the reports include.

Mr. Mody's report attributes the following items as adding value to the Property: (i) $2,000 for the slate patio, (ii) $1,000 for the utility shed and (iii) $1,000 for the storage area

under the porch. Mr. Thomas's report does not separately attribute any value to the patio, utility shed or storage area. Further, the reports vary in attributing value for the following items:

| Item: | Mr. Mody's Report | Mr. Thomas's Report |
|---|---|---|
| Additional room | $1,000 | $500 |
| Additional garage bay | $2,500 | $1,500 |
| Additional fireplace | $1,500 | $1,000 |
| Covered porch | $2,000 | $500 |

These differences in the respective debits and credits applied to the comparables help explain the $28,000 difference in the ultimate values reached.

Although "effective age" has little bearing on determining value under the sales comparison method, the court finds Mr. Mody's explanation and understanding in assigning an effective age of 35 years to the building, which is 44 years old and without any noted updates, more cogent than that proffered by Mr. Thomas in ascribing an effective age of 5-7 years. The court finds that Mr. Mody's use of an existing survey helped him to more precisely and accurately identify the Property and the comparables to be employed. As to those items for which both appraisers made adjustments, which are referenced in the table above, Mr. Mody's credits appear to the court to be more reasonable and supportable. Notwithstanding the considerable appraisal experience of both experts, the court credits Mr. Mody's knowledge and familiarity with both the Property, which he had appraised previously, and the comparables— some of which he had also appraised— to ultimately find his testimony more persuasive.

As to the shed which exists on the Property, the court finds sufficient support from the record to conclude that it is not a permanent improvement and, therefore, accords it no value. As for the storage area under the porch, the court finds that it adds only nominal value.

8

Accordingly, upon review of all of the testimony and evidence presented, the court finds a value for 5 Green Fir Circle of $132,200.

A further hearing in this matter shall be conducted by teleconference with counsel on July 24, 2013 at 1:45 p.m. The court shall initiate the call.

So Ordered.

Dated: July 3, 2013
      Syracuse, New York

                                   Margaret Cangilos-Ruiz
                                   United States Bankruptcy Judge